SAMUEL LEWIS BARBOUR and Another, as Receivers of R. H. BAKER COMPANY, INC., Appellants, *v.* THE STATE OF NEW YORK, Respondent.

(Claim No. 21997.)

Third Department, April 29, 1936.

*Benjamin McClung* [*Charles B. Sullivan* of counsel], for the appellants.

*John J. Bennett, Jr., Attorney-General* [*John L. Campbell, Assistant Attorney-General,* of counsel], for the respondent.

HEFFERNAN, J. Claimants, as the receivers of R. H. Baker Company, Inc., have appealed from a judgment of the Court of Claims dismissing on the merits their claim against the State of New York.

On November 12, 1928, R. H. Baker Company, Inc., hereafter referred to as the contractor, and the State of New York entered into a contract for the construction and installation of mechanical equipment in the power house and tunnels at Wassaic State School, Amenia, N. Y   As part of its entire heating contract the contractor was required to install in the power house, which was being erected by another State contractor, two units of horizontal engine driven fans or blowers to furnish air or forced draught for the boilers. This installation was to be placed in the fan room which was on a lower level than the firing level of the boilers.   The power house was located in a low spot on the site, the ground surface sloping down from the site of other buildings.   The power house was placed in part on ground which had been filled to a depth of about ten feet.   The engines were set on made ground.   The engines and blowers were to be installed on concrete foundations resting upon and connected with a concrete mat in the floor of the power house. The contract contained the provision: " The final payment shall not relieve the contractor of the responsibility for faulty materials or workmanship and he shall remedy all such defects   *   *   * which shall appear within a period of one year from the date of final certificate."   The bond contained a one-year guaranty that the contractor " Will make good any faults or defects in the work arising from improper or defective workmanship or materials which may appear during that period."

Work was commenced on the project in 1929 and on October twenty-second of that year was practically completed, on which date a flood occurred which undermined the mat causing it to settle and break.   The maximum settlement of the footing or mat where it cracked in two, and of the fan unit placed thereon, was nine and one-half inches.   At the time of this storm the flood waters inside the power house filled the pump pit with water, a pit twenty-five feet by twenty-five feet by seven feet, in this same pump pit or fan room.   At the direction of the State and under its supervision the contractor repaired the damage caused by the flood. In making the repairs the contractor placed over the damaged area a solid monolithic mat of concrete, three feet thick, reinforced by three-ply of railroad iron laid in lattice-work formation to the extent of 3,000 pounds.   This mat was sixteen feet long and twelve feet wide and underlaid the entire area occupied by both the engine and the blower.   Upon this mat and firmly attached to it were the foundations for the engine and blower.   It is undisputed that the contractor did this work properly.   The repairs were completed in February, 1930, and the engine and blower operated for a period of

about forty days, up to May fourth. In May and again in July the equipment was tested and on September 19, 1930, it was accepted and paid for by the State. After its operation from February to May the engine and blower were not operated until October thirtieth when the authorities in charge of the institution desired to turn on the heat. An unusually heavy rain storm again occurred on October 30, 1930, equal in severity to that of the previous year. The engine and blower were operated from October 30 until November 5, 1930, on which latter date the shaft broke. The part which broke was a revolving horizontal steel engine shaft, five inches in diameter, rigidly coupled end to end to a fan blower shaft, which concededly fractured from torsional strain.

Under the provisions of the contract the State called upon the contractor to repair the broken shaft, which it did, under protest, at a cost of $3,439.08. This amount is not disputed. The contractor filed a claim for such amount on the ground that the break was not due to any cause for which it was responsible. The sole question for determination is whether the breaking was due to defective material or installation or whether it was due to a second sinking of the mat upon which the foundations were laid following the storm of October 30, 1930.

The State first took the position that the break was due to defective material. By letter dated December 8, 1930, the State's representatives directed the contractor to replace the shaft upon the ground that the break was due to defective material therein, and stated, " This shaft was manufactured from a defective piece of steel as the break shows a flaw in the material." Upon the trial the State abandoned this position and relied solely on the contention that the contractor originally installed the shaft out of alignment.

The contractor contended that the fracture of the shaft was due to foundation settlement or fracture of a footing mat, concededly not covered by its guaranty, which settlement threw the fan unit and the engine unit out of the same level, and the engine shaft bearing and the two fan shaft bearings out of alignment, causing the shaft to break due to torsional strain. The evidence shows that the engine shaft had been manufactured of proper material, was of sufficient tensile strength and that there were no flaws in the metal. It had been carefully tested in operation. Laboratory tests of the metal showed no flaw or defect and established that without undue torsional strain the fracture would not have occurred. It is undisputed that the respective shaft bearings of the engine and of the fan were found out of alignment after the fracture and that this misalignment

had produced the torsional strain which caused the break. The court below found: " That the misalignment of the engine and blower *was due to some cause not clearly made evident to the court. Apparently* it was caused by faulty installation or some inherent weakness that developed in the machinery itself." It is to be noted that the court made no actual, definite finding as to the cause of the misalignment. The court thereupon based the following conclusion of law upon such finding: " The State not having been in any way responsible for the breaking of the shaft, the claimants cannot recover against the State for the repair of the same."

The court below found that there had been no settlement of the foundation mat. This finding is not supported by any evidence. The State's mechanical engineer, Thornton admitted that it would not require a settlement of more than a " very few thousandths of an inch getting the foundation out of center to produce a torsional strain upon that shaft as it was revolving." In order to determine whether or not a foundation settlement occurred the contractor under date of December 3, 1930, requested the State's representatives to agree " That a date be set at which time your engineers and representatives from this company can meet at the plant with necessary instruments to determine whether there has been any change in the condition of the subsoil, floor and foundations, which if so we feel would relieve us of the responsibility of damage to this equipment." Although the contractor repeatedly sought to have a joint inspection to accurately ascertain with proper instruments whether there had been foundation settlements, advising that its own readings of floor elevations showed a two-inch difference in elevations, the State refused to co-operate in the request which obviously would have settled the controversy. Later and upon the trial the State only offered testimony of eye observations made of the floor above the foundation mat, and conclusions therefrom, as opposed to the contractor's definite proof through actual measurements and elevations taken by it that the foundations of engine and fan had gone out of level and alignment.

The inference urged by the State, and apparently accepted as a possibility by the court below, that the shaft was originally set out of alignment is not plausible. The State's inspector testified that it was set " with a great deal of care and precision." If it had not been in alignment the flanges on the shaft ends could not have been united in a rigid coupling. If the shaft had been set out of alignment in February, the engine could not have successfully operated for forty days during the official tests. Bearings would have heated, vibration would have been set up and the shaft

would have become noisy and it would have broken very quickly. On November 5, 1930, before the shaft broke, the vibration became noticeable between ten and eleven A. M., and the shaft broke with a crash about two-thirty P. M.

The court below made no finding that the fracture was due to defective material or installation. In fact it refused to make such a finding. The court merely found that the misalignment "was due to some cause not clearly made evident to the court." His reasoning is the foundation for the court's conclusion that: "The State not having been in any way responsible for the breaking of the shaft, the claimants cannot recover against the State for the repair of the same." Apparently the court dismissed the claim upon the erroneous theory that claimants had the burden of establishing that the State was responsible for the breaking of the shaft. The burden was on the State to show that the break was due to defective materials or workmanship for which the contractor had assumed responsibility. That burden the State did not sustain. In the absence of a finding to that effect, supported by evidence, there is no basis on which to support the judgment of dismissal. Moreover, the proof in this record not only justifies but requires a finding that the fracture was due solely to foundation settlements.

The judgment appealed from is reversed on the law and facts and judgment directed in claimants' favor for $3,439.08, with interest from March 13, 1931, together with costs.

HILL, P. J., McNAMEE, CRAPSER and BLISS, JJ., concur.

Judgment reversed on the law and facts and judgment directed in claimants' favor, with interest from March 13, 1931, together with costs.

The court hereby reverses findings of fact contained in the decision numbered 27, 28, 29, 31, 32 and 33. The court also disapproves of conclusions of law numbered 1 and 2 contained in such decision.

The court also reverses the findings of fact contained in the State's request to find, and found by the court below, numbered 17, 19, 20, 23 and 24. The court also disapproves of the conclusion of law, numbered 2, contained in the State's request to find, and found by the court below.

The court hereby finds the findings of fact contained in the claimants' requests to find, and refused by the court below, numbered 13, 17, 18 and 19.

The court also finds as a conclusion of law the second conclusion of law contained in claimants' requests to find and refused by the court below.